The Honorable Judge Ricardo S. Martinez<br>Sentencing: September 5, 2008

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
## AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,   ) <br> ) <br>          Plaintiff,      ) <br>     v.                   ) <br>                          ) <br> KYLE GIANIS,              ) <br>                          ) <br>          Defendant.      ) <br> _____) | Cause No.  No. CR04-334RSM <br><br> **Defendant's Sentencing Memorandum** |

Comes now the defendant, Kyle Gianis, through his attorney, Peter A. Camiel, and submits this memorandum for the Court's consideration in determining the appropriate sentence in this case.

### The Charge

Kyle Gianis was found guilty following jury trial on a charge of conspiracy - possession of ephedrine with intent to distribute. This charge carries a maximum sentence of 20 years in prison. Probation has recommended a term of 180 months. The government recommendation has not yet been received.

### Defense Recommendation

Defense counsel recommends that the Court impose a term of imprisonment of 72 months to be followed by a term of supervised release along with a $100 penalty assessment.

**Defendant's Sentencing Memo** - 1

<i>Mair & Camiel, P.S.</i><br>710 Cherry Street<br>Seattle, Washington 98104<br>(206) 624-1551  Fax: 623-5951

## Background

At the time of the offense in this case, in March of 2004, Kyle Gianis was 20 years old and living with his father in Surrey, B.C. and working for a flooring company.

Perhaps the best understanding of who Kyle was at that time in his life comes from his mother, Stephanie, in her letter to the Court:

> "As mother of Kyle Gianis, it is with great sadness that of necessity I write to you on behalf of my son.
>
> As a youngster, Kyle was quiet, caring of others and wanting to fit in. We lived in a poor area in Surrey, British Columbia and Kyle did not have many friends. He had an older brother whom he looked up to, and looked to him for approval. Kyle's father was a long distance truck driver who was hardly ever home. When he was home, he was bad tempered, drank and smoked marijuana, was verbally and physically abusive to myself and the kids.
>
> I left the family home, and to my everlasting regret, abandoned Kyle and my other two children. Kyle being the youngest was only 7 years old. Without much formal education, little work experience, my ability to provide a decent home was limited by the minimum wage jobs I was able to get. I finally realized that by remaining in their family home, at least they could be assured of a roof over their head, food and clothing.
>
> Very shortly after I left, my place as a mother was filled by my neighbor / stepmother, who did not like the boys. Kyle's father told Kyle that his mother did not love or care about him and this left him feeling abandoned and insecure. It was some time before I was allowed to visit or even talk to the children and regain my children's trust and affection.
>
> Kyle has always been caring of me and his siblings. When Kyle was younger, he was the victim of a hit and run accident of which he was to receive a large amount of money which was held in trust until he reached 18 years old. He was a very resourceful young man and with that money he bought, restored and sold vehicles.
>
> I am sure that every mother writing or speaking to you on behalf of her son will say that he is a good son. Kyle is and will always be a good and worthy human being. I trust that the above information and facts presented to you of Kyle's life will be of assistance.

In contrast to the above, the government has portrayed Kyle Gianis at age 20 as some sort of drug kingpin or gang member who played a pivotal role in the importation of the two drums of ephedrine.

## The Offense Conduct

Kyle has maintained that he was not involved in the importation of the two drums of ephedrine. The government case was far from overwhelming. The government relied almost exclusively upon the

**Defendant's Sentencing Memo** - 2

*Mair & Camiel, P.S.*
710 Cherry Street
Seattle, Washington 98104
(206) 624-1551 Fax: 623-5951

testimony of two less than reliable witnesses. The government had no firm corroboration to support its case such as police surveillance or forensic evidence. If Kyle was involved, it appears from the evidence that his role was that of putting together Adam Tsoukalas with the unidentified Asian male who delivered the two drums of ephedrine. The testimony at trial, if it is credible, is that the Asian male had brought the drums of ephedrine in his car to Kyle's house and that the ephedrine was transferred from that person's car to David Youngberg's car in the presence and with the assistance of Kyle Gianis, the Asian male, Adam Tsoukalas and David Youngberg. Thereafter, according to the testimony given at trial, Adam Tsoukalas and David Youngberg drove to the border. While they were in line at the border they had telephone contact with the Asian male who called to check on their progress. Later, while in the Customs office Tsoukalas again had phone contact with the Asian male, but not with Kyle. Tsoukalas could or would not divulge the identity of the Asian male.

Curiously, if Kyle was supposed to retrieve the ephedrine on the United States side of the border as was alleged, he never showed up or even tried to cross the border. Shortly after the arrest of Tsoukalas and Youngberg the agents had Tsoukalas place a call to Kyle and learned that he was at home in B.C., not in the United States or even waiting to cross the border. The other point that seems clear is that 20 year old Kyle Gianis would not have had the ability to secure two drums of ephedrine valued at over $100,000. He could have been no more than one of the couriers recruited to assist in the transport of the ephedrine.

### Criminal History

The presentence report contains a great deal of disputed information concerning Kyle Gianis' involvement in criminal activity most of which are unproven allegations. It is important to note, however, that the presentence report notes that Kyle Gianis has only one adult misdemeanor conviction for unlawful possession of a firearm when he was 21 years old and a juvenile adjudication for possession of a controlled substance when he was 17.

### Kyle's Education

**Defendant's Sentencing Memo** - 3

Kyle never finished high school. While he was in high school, he began working part time at an Arco gas station and also began working on cars. Kyle switched over to a "work and learn" school for a while so that he could continue to work during the school years. He enjoyed the work and earning his own money and ultimately left school to continue working.

Part of Kyle's disinterest in school came as a result of an accident in which he was hit by a car at age 15. Kyle was seriously injured, suffering damage to his knee, a broken collarbone, injury to his shoulder, and a head injury that required surgery. As described by Kyle's mother, Kyle received a lump sum settlement payment of $70,000 when he turned 18. It was from this money that Kyle was able to buy his own house after he turned 18..

### History of Employment

Throughout high school, Kyle worked. He worked at an Arco gas station in downtown Vancouver for about a year and a half earning $8 an hour. He also began working buying, fixing and re-selling cars and working on motorcycles. Kyle bought and fixed and sold between 25 and 30 cars and he custom built 3 motorcycles that he sold. At the time Kyle was arrested, he was working for a company T.B.M. (The Best Masterwood), a hardwood flooring company out of Burnaby, B.C. Kyle worked as an estimator giving quotes for flooring. The company was owned by his girlfriend's father. For two and a half years, Kyle worked at this company up until the time he was arrested. Prior to that, Kyle worked with his father at Canada Bread in Langley, B.C. Kyle worked loading trucks and stocking. He held this job for two years. During the entire time, however, Kyle continued to work on cars and motorcycles. Kyle's 2006 income tax and benefit return for Canada revenue shows a reported employment income of $49,200. His 2007 tax return shows an income of $59,400. This was all salary earned from working as an employee of the hardwood flooring company.

### United States Sentencing Guidelines

The charge in this case carries a maximum sentence of 20 years. The United States Probation Office has calculated the sentencing guidelines with a base offense level of 38. In addition, they have added 2 levels for Mr. Gianis' role in the offense giving him an adjusted guideline offense level of 40.

**Defendant's Sentencing Memo** - 4

Kyle has no criminal history points. Probation thus has calculated a sentencing guideline range of 292 to 365 months, however, the statutory maximum is 240 months. Probation has recommended a sentence of 180 months.

There is no longer a presumption of reasonableness in a sentence within the sentencing guideline range. __ F. 3d __(9th Cir. 2008). The guidelines are only one of many factors that the court must now consider.

A sentence within the United States Sentencing Guidelines would be unreasonable and far more than necessary to meet the purposes of sentencing in this case. For the reasons stated below, this Court should impose a reasonable sentence of 72 months which is proportional to the sentence imposed upon Mr. Tsoukalas and Mr. Youngberg.

According to the United States Sentencing Guideline Commission 2007 final quarterly report on sentencing statistics, males who are under age 21 at the time of the commission of the offense made up only 2.4% of all males sentenced by federal courts. Thus, Kyle Gianis is in the small minority of individuals who appear before the federal court given his age at the time of the offense in this case.

Kyle Gianis should not be punished for exercising his constitutional right to go to trial. The Court itself acknowledged the closeness of the case that was presented by the government. Kyle Gianis did not testify nor did the defense call any witnesses, but instead the defense challenged the credibility of the government's evidence. Kyle Gianis had every right to do this and the sentence he receives should not be enhanced because he exercised his trial rights.

There are not a lot of comparative cases involving ephedrine for the Court to use to determine what others similarly situated have received as sentences. The two co-defendants' sentences should be used for purposes of comparison. While both co-defendants pled guilty and cooperated, it is usually the case that cooperation results in a reduction of about 50% from the low end of the guideline range. Mr. Youngberg received a sentence of 21 months and Mr. Tsoukalas received a sentence of 5 years. These are the sentences the Court should use for purposes of determining the appropriate sentence for Kyle Gianis.

**Defendant's Sentencing Memo** - 5

Prior to the Supreme Court decision in United States v. Booker, it had already been held that a downward departure from the guidelines was appropriate where the imposition of a standard range sentence would create a huge unjustified disparity: "Downward departure to equalize sentencing disparity is a proper ground for departure under the appropriate circumstances." United States v. Daas, 198 F.3d 1167, 1180-1181 (9th Cir. 1999), *cert. denied*, 531 U.S. 999 (2000) (pseudo-ephedrine case where defendant was denied a downward departure that he sought on the basis of sentence disparity; case remanded for consideration of the departure request); United States v. Ray, 920 F.2d 562 (9th Cir. 1990) amended, 930 F.2d 1368, 1372-1373 (9th Cir. 1991) ("disparity was said to be one of the most important evils the guidelines were intended to cure").

The presentence report correctly points out that a sentence of 20 years would be four times as long as the sentence received by Adam Tsoukalas. That disparity seems quite unreasonable. So does a sentence of 180 months which is three times the sentence received by Mr. Tsoukalas.

In researching other ephedrine case sentences, there do not appear to have been a great number of ephedrine cases, but have been more pseudo-ephedrine cases which use the same guidelines. See Section 2D1.11.

The case herein involves approximately 50 kilograms of ephedrine. In an 8th Circuit case, United States v. Frazier, 408 F.3d 1102 (8th Cir. 2005), a defendant therein was convicted of conspiring to distribute 244 kilograms of pseudo-ephedrine. The defendant in Frazier received a sentence of 188 months. Mr. Frazier, according to BOP records is now 53 years old, so he was about 48 years of age at the time of the offense.

In this District in a recent pseudo-ephedrine case, United States v. Karawi (CR04-398L) involving the same government prosecutor, following trial Mr. Karawi who was age 34, was sentenced to a 144 months in prison following his conviction for distributing or possessing over 16 cases of pseudo-ephedrine. The government had recommended a sentence of 20 years. Mr. Karawi was found to have a base offense level of 38 and was a criminal history category II which resulted in a guideline range of

**Defendant's Sentencing Memo** - 6

262 to 327 months.  Karawi's criminal history included his involvement in a recent shooting of his own cousin.

### Kyle Gianis' Youth at the Time of the Offense is a Mitigating Factor the Court Should Consider

At the time of the offense in 2004, Kyle Gianis was 20 years old.  He was in fact years younger than Adam Tsoukalas by over two years.  To impose a sentence anywhere near that suggested by the United States Sentencing Guidelines upon a person who was 20 years old at the time the offense was committed would be unduly harsh.

While it is true that under the government's version of events, which is disputed, Kyle Gianis is alleged to have recruited Adam Tsoukalas, Adam Tsoukalas went on to recruit David Youngberg.  Kyle and David Youngberg did not know each other.  Adam Tsoukalas would have faced the exact same guideline range faced by Kyle Gianis.  Indeed, Adam Tsoukalas' guidelines could have even been higher because he could have received an obstruction of justice enhancement as a result of his having been untruthful to the authorities when he was first questioned.  He also could have received an obstruction enhancement because he coached David Youngberg into fabricating a story that Kyle Gianis had borrowed Youngberg's car earlier on the day of the arrest. Tsoukalas, however, was allowed to plead guilty to a lesser charge of attempted distribution of ephedrine which carried a five year statutory maximum.  Indeed one of the reasons that the government agreed to reduce the charge with regard to Adam Tsoukalas which the government cited in its sentencing memorandum to Judge Coughenour for Adam Tsoukalas was "the defendant's age."

Defense counsel has reviewed prior sentences imposed in other types of drug cases on defendants who were 20 years old at the time of the offense.  It is rare to find any case where a court has imposed over 10 years in prison on any defendant who was involved in a drug case that did not involve a firearm where the defendant was 20 years old at the time of the offense.

### Kyle Gianis' Upbringing

**Defendant's Sentencing Memo** - 7

*Mair & Camiel, P.S.*
710 Cherry Street
Seattle, Washington  98104
(206) 624-1551  Fax:  623-5951

As indicated in the letter from Kyle Gianis' mother, Stephanie, and confirmed by Kyle's father, Chris Gianis, Kyle had a difficult childhood. His parents divorced when he was 3 years old. Prior to the divorce, Kyle recalls his parents not getting along and often having verbal arguments. After his parents divorce, his father, who was a long haul truck driver, was rarely home. Kyle was not told of the reason that his mother had left for a number of years. After his mother left, his father continued to be a long haul truck driver and Kyle was cared for by his older sister. Years later, when Kyle was 9 years old, his father began a relationship with a neighbor lady, Rennie Ramey. The sequence of his father not being around, his mother unexplainedly leaving his life, and then his father beginning a relationship with a new woman was difficult for Kyle to handle. As a result, a lot of pent up anger began to boil over as Kyle became a teenager.

In essence, since the time Kyle was a young teenager he has, to a large degree, been on his own. He has always had a job since he was a young teenager. He has been able to support himself. When he received the settlement from the car accident in which he was injured when he was 15 years old, he had funds that were used to purchase a home. Since being incarcerated, he has been unable to make the mortgage payments and if his parents are unable to sell the home for him, it will go into foreclosure.

By age 17, Kyle was completely supporting himself. He was working full time at regular day jobs as well as working on cars and motorcycles. At age 17, Kyle also began training in the mixed martial arts hoping to become a professional fighter.

Kyle also suffered a tragedy several years ago when he and his girlfriend's child died at birth due to complications of a premature birth. This was Kyle's first experience with the death of someone close to him.

In 2004, Kyle's brother, Nick, was shot three times in the back at a McDonald's. Kyle received a call that evening that his brother had been shot. Kyle was on the phone with his brother, Nick, as Nick waited for the ambulance to arrive. Kyle drove to the location to find the police present and his brother being taken away in an ambulance. Nick had numerous surgeries and was in a coma for four months. Kyle sat at his brother's bedside almost every day and would talk to his unconscious brother. Kyle

**Defendant's Sentencing Memo** - 8

learned that his brother was shot because he was suspected of being a witness to another shooting and it was rumored he was cooperating with the police. After Nick regained consciousness and came home, Kyle acted as his brother's protector. He was constantly concerned his brother would be attacked again. A news article submitted by the government and reference in the presentence report about shots being fired <u>at</u> Kyle's house is related to a shooting that took place after Kyle's brother was home from the hospital. Kyle believed the shooters were again after his brother.

Kyle's sister Jinki Gianis in her letter to the Court notes her belief that Nick's shooting was so traumatic for Kyle that she believes Kyle should have received counseling. Coupled with the loss of his newborn child in the last serveral years Kyle has gone through a number of traumatic events for which he has never received any type of mental health counseling.

18 USC § 3553(a) directs the Court to impose a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of sentencing. The question before the Court then is how much time in custody is sufficient. A term of 72 months would likely mean Kyle would be over 30 years old upon his release. By any measure, incarceration for 25% of one's life (Kyle is now 24 years old) is a substantial term.

**Conclusion**

Before the Court is a 24 year old young man who in his short life has survived a broken home and difficult childhood, a severe car accident that left him seriously injured, the death of a child, and the near death of his older brother due to violence. Kyle is an energetic, hardworking young man who has made some poor choices in terms of friends he has chosen and activities in which he became involved. At the same time, however, Kyle has good qualities and a good family who support him.

DATED this 2nd day of September, 2008.

Respectfully submitted,

  /s/   Peter A. Camiel

Peter A. Camiel, WSBA #12596

**Defendant's Sentencing Memo** - 9

## CERTIFICATE OF SERVICE

I hereby certify that on September 2, 2008 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the attorney(s) of record for the defendant(s) and plaintiff.

/s/   Peter A. Camiel, WSBA #12596

Attorney for Kyle Gianis

**Defendant's Sentencing Memo** - 10

*Mair & Camiel, P.S.*
710 Cherry Street
Seattle, Washington  98104
(206) 624-1551  Fax: 623-5951